IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NICHOLAS DAVIS, as Personal
Representative of the wrongful death
estate of Pete Jacob Martinez,

     Plaintiff,

v.                                           Case No. 1:25-cv-00167-LF-JMR

CITY OF ALBUQUERQUE and
ANGELO LOVATO,

     Defendants.

## MEMORANDUM OPINION & ORDER

THIS MATTER is before the Court on the motion of defendants City of Albuquerque ("City") and Angelo Lovato for summary judgment as to all of Plaintiff's claims. *See* Doc. 64. Plaintiff Nicholas Davis, as personal representative of the wrongful death estate of Pete Jacob Martinez, opposes the motion. *See* Doc. 74. The motion was fully briefed on November 5, 2025. *See* Doc. 87. For the following reasons, the Court denies the motion.

### INTRODUCTION

This case arises from the fatal shooting of Mr. Martinez by Albuquerque Police Department ("APD") Detective Angelo Lovato on November 25, 2023. Doc. 1-2 at 1–2. Plaintiff filed this lawsuit in the Second Judicial District Court of New Mexico on June 4, 2024. Doc. 1 ¶ 1. Plaintiff filed an amended complaint on February 5, 2025. Doc. 1 ¶ 2; *see* Doc. 1-2. Defendants removed the case to this Court on February 18, 2025. *See* Doc. 1.

In his amended complaint, Plaintiff asserts that (1) Detective Lovato's use of deadly force against Mr. Martinez deprived Mr. Martinez of his rights under Article 2, Sections 10 and 18, of the New Mexico Constitution, Doc. 1-2 ¶¶ 76–79; (2) the City violated the New Mexico Constitution in its "maintenance of a custom of excessive force against people in crisis, its deliberate failures to implement reforms, and its decision to authorize and empower Defendant Lovato to use deadly force against people in crisis despite his history," *id.* ¶¶ 80–86; (3) Detective Lovato is liable under 42 U.S.C. § 1983 for violating Mr. Martinez's rights under the Fourth and Fourteenth Amendments of the United States Constitution, *id.* ¶¶ 87–90; (4) the City of Albuquerque is municipally liable under § 1983 for Detective Lovato's unconstitutional use of force, *id.* ¶¶ 91–98; and (5) Detective Lovato and the City are liable for battery, and the City is liable for negligence resulting in battery under the New Mexico Tort Claims Act, *id.* ¶¶ 99–103; Doc. 74 at 37.

On August 28, 2025, Defendants moved for summary judgment in their favor on all claims in Plaintiff's Amended Complaint. *See* Doc. 64. In sum, Defendants argue that Detective Lovato did not violate Plaintiff's federal or state constitutional rights, and the City cannot be held liable without an underlying constitutional violation. *Id.* at 13–29, 34. Additionally, Defendants argue that Plaintiff cannot prevail on his tort claims because Detective Lovato's use of force was not an unlawful battery, and the City cannot be held liable for negligence resulting in battery if the battery was committed by a law enforcement officer. *Id.* at 29–34.

2

**FACTUAL BACKGROUND**[1]

On November 25, 2023, APD Seargent Christopher Poccia was working with loss prevention personnel at a Kohl's department store in Cottonwood Mall in Albuquerque. Doc. 64 ¶¶ 1–2; Doc. 74 at 2. Loss prevention personnel notified Seargent Poccia that a man and woman were allegedly shoplifting a felony amount of merchandise from Kohl's; the man was later identified as Mr. Martinez. Doc. 64 ¶¶ 2–3; Doc. 74 at 2. Seargent Poccia requested that other officers assist him at the scene, and APD Officer Steven Reazin responded and arrived at Cottonwood Mall. Doc. 64 ¶¶ 5–7; Doc. 74 at 2.

Sergeant Poccia drove in his marked police vehicle to the southeast corner of Kohl's, where the suspects were last seen, and activated his police emergency equipment before announcing, "Stop! Police, you're under arrest." Doc. 64 ¶ 8; Doc. 74 at 2. The female suspect complied, but Mr. Martinz fled on foot through the parking lot. Doc. 64 ¶ 8; Doc. 74 at 2. Officer Reazin pursued Mr. Martinez through the parking lot while driving his marked police vehicle with emergency lights activated. Doc. 64 ¶ 9; Doc. 74 at 2. The parking lot was not vacant, and multiple people were shopping at Cottonwood Mall at the time. Doc. 64 ¶ 10; Doc. 74 at 2. Officer Reazin eventually exited his police vehicle and continued his pursuit of Mr. Martinez on foot. Doc. 64 ¶ 11; Doc. 74 at 2.

APD Acting Sergeant Adam Greenhaw and APD Sergeant Ross Vanderlip joined the foot pursuit in the parking lot. Doc. 64 ¶ 12; Doc. 74 at 2. During the pursuit, Mr. Martinez drew a

---

[1] "The first step in assessing the constitutionality of [an officer's] actions is to determine the relevant facts." *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)). The Court has attempted in this recitation of facts to include only those facts which the parties do not dispute. For any disputed facts, the Court cites to the underlying exhibits and other materials in the record, as necessary. *See* FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

firearm and continued to flee from the officers with the gun in his hand.  Doc. 64 ¶ 14; Doc. 74 at 2.  Officer Reazin, Acting Sergeant Greenhaw, and Sergeant Vanderlip also drew their firearms as they pursued Mr. Martinez.  Doc. 64 ¶ 14; Doc. 74 at 2.  Acting Sergeant Greenhaw ordered Mr. Martinez multiple times during the pursuit to get on the ground, but Mr. Martinez continued to flee.  Doc. 64 ¶ 15; Doc. 74 at 2.

Mr. Martinez then entered a Cold Stone Creamery store with multiple people inside.  Doc. 64 ¶ 16; Doc. 74 at 2.  Acting Sergeant Greenhaw told the people inside to exit the Cold Stone and also announced over his radio that Mr. Marinez was armed inside the store.  Doc. 64 ¶ 16; Doc. 74 at 2.  Mr. Martinez took off the sports jersey he was wearing and fled out of the back of the Cold Stone.  Doc. 64 ¶ 18; Doc. 74 at 2.  After confirming with a witness that a man he saw running from Cold Stone was Mr. Martinez, Acting Sergeant Greenhaw relayed over the radio that Martinez was wearing a white shirt and black hoodie and was fleeing southbound on Alameda Boulevard.  Doc. 64 ¶¶ 19–20; Doc. 74 at 2.

APD Auto Theft Sergeant Armando Hernandez and APD Auto Theft Detective Angelo Lovato heard over the police radio that Mr. Martinez was armed and fleeing through the mall parking lot, so they drove to the mall to assist.  Doc. 64 ¶ 21; Doc. 74 at 2.  Before arriving on scene, Sergeant Hernandez told Detective Lovato that the incident involved a felony shoplifting offense.  Doc. 64 ¶ 22; Doc. 74 at 2.  APD Officers Jacob Osborne and Carlos Gudino also arrived on scene to assist.  Doc. 64 ¶ 25; Doc. 74 at 2.  While driving on Alameda Boulevard, Officer Osborne saw Mr. Martinez fleeing through traffic.  Doc. 64 ¶ 27; Doc. 74 at 2.  Officer Osborne exited his police vehicle and pursued Mr. Martinez on foot, ordering Mr. Martinez to show his hands and yelling at him several times to stop and drop his gun.  Doc. 64 ¶¶ 27–29;

4

Doc. 74 at 2.  Mr. Martinez did not comply and continued to flee through traffic on Alameda Boulevard.  Doc. 64 ¶ 30; Doc. 74 at 2.

After Mr. Martinez crossed Alameda Boulevard, he fled into the parking lot of a business called Chrome Aesthetics.  Doc. 64 ¶ 31; Doc. 74 at 2.  Mr. Martinez stopped running at this point and walked towards the entryway of the business.  Doc. 64 ¶ 32; Doc. 74 at 2.  Officers Gudino and Osborne followed behind Mr. Martinez on foot, ordering Mr. Martinez to drop his gun.  Doc. 64 ¶ 32; Doc. 74 at 2.  As the officers approached Mr. Martinez, Mr. Martinez put the gun to his head and continued to walk away from them.  Doc. 64 ¶ 34; Doc. 74 at 2.  The officers shouted at Mr. Martinez, "No, don't do it!"  Doc. 64 ¶ 34; Doc. 74 at 2.  Mr. Martinez stopped in front of Chrome Aesthetics with the gun still to his head.  Doc. 64 ¶ 35; Doc. 74 at 1–2.

Officer Reazin drove his police vehicle, with lights and sirens activated, to the east part of the Chrome Aesthetics parking lot.  Doc. 64 ¶ 36; Doc. 74 at 3.  Officer Reazin parked his vehicle to the front left of where Mr. Martinez was positioned and stood behind his car door with his rifle drawn but not pointed at Mr. Martinez.  Doc. 64 ¶ 38; Doc 74 at 3.  Mr. Martinez still had the gun to his head and was crouched down.  Doc. 64 ¶ 37; Doc. 74 at 3.  Officers Osborne and Gudino were standing in a vacant parking space with no cover between them and Mr. Martinez.  Doc. 64 ¶ 40; Doc. 74 at 3.

Officer Osborne tried to convince Mr. Martinez to put the gun down, but Mr. Martinez did not comply.  Doc. 64 ¶¶ 41–42; Doc. 74 at 5.  Officer Osborne asked what he could do to get Mr. Martinez to drop the gun, and Mr. Martinez said that if the officers let him smoke a cigarette, "then you guys can arrest me."  Doc. 74 at 9; Doc. 87 at 8.

Acting Sergeant Greenhaw and Sergeant Vanderlip had followed Officers Osborn and Gudino to the scene, and they told the officers multiple times to get behind cover.[2]  Doc. 64 ¶ 44; Defs.' Ex. D at 00:02:25–00:03:00; Defs.' Ex. E at 00:02:19–00:02:55.  Officers Osborne and Gudino backed up from where they were standing, and Sergeant Vanderlip requested that a police unit arrive on scene to provide cover.  Doc. 64 ¶ 45; Doc. 74 at 3.

At 3:47 p.m., Detective Lovato arrived on scene, parked his unmarked police vehicle on Ellison Road across from Chrome Aesthetics, and exited his vehicle with this rifle.  Doc. 64 ¶ 51; Doc. 74 at 3; Defs.' Ex. I. at 00:00:28–00:00:35; Defs.' Ex. F. at 00:03:48–00:04:00.  Mr. Martinez still was crouched in front of Chrome Aesthetics with the gun to his cheek.  Doc. 64 ¶¶ 52–53; Doc. 74 at 3; Defs.' Ex. F at 00:03:51–00:04:00.  At about 3:48 p.m., Sergeant Hernandez drove into the parking lot in response to Sergeant Vanderlip's request that a police unit arrive to provide cover.  Doc. 64 ¶ 46; Doc. 74 at 3; Defs.' Ex. H at 00:01:08–00:01:25.  Sergeant Hernandez parked his unmarked SUV to the right side of where Mr. Martinez was positioned and to the left of Vanderlip, Osborne, Gudino, and Greenhaw.  Doc. 64 ¶ 46; Doc. 74 at 3; Defs.' Ex. D at 00:04:43–00:04:45.  Sergeant Hernandez perceived Acting Sergeant Greenhaw, Sergeant Vanderlip, and Officers Osborne and Gudino to be at a disadvantage because they did not have their vehicles with them, and because Mr. Martinez had more cover than they did.  Doc. ¶ 48; Doc. 74 at 3.  Only Sergeant Vanderlip and Acting Sergeant Greenhaw

---

[2] Plaintiff did not address this factual statement in his response.  The Court may thus "consider the fact undisputed for purposes of the motion."  FED. R. CIV. P. 56(e)(2); *see also* D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  The Court also reviewed Defendants' submitted exhibits and confirmed that this fact is properly supported.  *See Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).  The Court accordingly cites to the relevant exhibits.

repositioned themselves next to Sergeant Hernandez's vehicle, and they did not have a full view of Mr. Martinez.  Doc. 64 ¶¶ 49–50; Doc. 74 at 3.

As Sergeant Hernandez parked his SUV, Mr. Martinez stood up with the gun still pointed at his head.  Doc. 64 ¶¶ 52–53; Doc. 74 at 3; Defs.' Ex. D at 00:04:43–00:04:47.  Detective Lovato laid down behind a rock and positioned his rifle over the rock.  Doc. 64 ¶ 55; Doc. 74 ¶ 10; Defs.' Ex. F at 00:03:59–00:04:20.  At the same time, Mr. Martinez lowered the gun from his head and put it down to his side, pointing to the ground.  Defs.' Ex. F at 00:04:12–00:04:15; Defs.' Ex. K at 00:02:01–00:02:11.  Mr. Martinez said to the officers, "Let me just smoke a cigarette, I'll put it down."  Defs.' Ex. F. at 00:04:16–00:04:18.  The officers again ordered Mr. Martinez to put his gun down.  *Id.* at 00:04:22–00:04:28.  Mr. Martinez said to the officers, "I'm not going to shoot at you guys.  Maybe I should kill myself."  *Id.* at 00:04:26–00:04:32; Doc. 74 at 9; Doc. 87 at 16; Pl.'s Ex. 19 at 2.  An officer responded to Mr. Martinez, "We don't want that either, man."  Defs.' Ex. F at 00:04:32–00:04:35.

Sergeant Hernandez then retrieved a less-lethal 40-millimeter launcher from his vehicle; at the same time, Acting Sergeant Greenhaw and Sergeant Vanderlip ordered Mr. Martinez multiple times not to move and to put his gun down.  Doc. 64 ¶¶ 59–60; Doc. 74 at 4; Defs.' Ex. H at 00:01:40–00:01:55.  Detective Lovato yelled at the other officers, "Hey, get cover behind the engine block!"  Doc. 64 ¶ 64; Doc. 74 at 4; Defs.' Ex. I at 00:01:34–00:01:37.  At 3:49 p.m., Sergeant Hernandez ordered Mr. Martinez to put the gun down and then announced, "40-40-40."  Defs.' Ex. H at 00:02:12–00:02:18.  Detective Lovato heard Sergeant Hernandez announce "40-40-40" and understood that to mean that Sergeant Hernandez had the 40-millimeter launcher.  Pl.'s Ex. 2 at 3.

The parties dispute Mr. Martinez's movements in the following moments. The video evidence shows Mr. Martinez patting the sides of his pants as if feeling for something in his pockets. Defs.' Ex. K at 00:02:30–00:02:51. Mr. Martinez first pats the side of his left leg with his left hand, before transferring the handgun from his right hand to his left hand. *Id.* at 00:02:30–00:02:50. Mr. Martinez then begins to pat down his right leg with his right hand. Ex. K at 00:02:50–00:02:51. Plaintiff asserts that "the muzzle of the gun remained pointed at the ground and did not lift or point in the direction of [Officer] Reazin, any other police officer, or the public." Doc. 74 at 11. Defendants cite Sergeant Hernandez's testimony that he perceived Mr. Martinez to begin lifting the gun up and Detective Lovato's statement on scene that Mr. Martinez was lifting the gun. Doc. 87 at 10–11 (citing Defs.' Ex. S at 6; Defs.' Ex. I at 00:01:40–00:01:42).

The testimony of the officers as to the movement of Mr. Martinez's hands in these moments varies. Sergeant Vanderlip testified that Mr. Martinez stepped out of his view and that he did not have a view of him when Sergeant Hernandez fired the 40-milimeter launcher. Defs.' Ex. N. at 3. Acting Sergeant Greenhaw testified that he did not have a full view of Mr. Martinez, but that he did see Mr. Martinez transfer the handgun from one hand to another. Defs.' Ex. O at 2. Officer Reazin testified that he did not perceive the transition of the handgun from Mr. Martinez's right hand to his left hand as an increase in the threat he posed "[b]ecause the gun was pointed at the ground the whole time." Pl.'s Ex. 1 at 3. Officer Reazin, however, also testified that he was looking at the other officers on scene and not at Mr. Martinez when Sergeant Hernandez announced "40-40-40." Doc. 87-1 at 1. Officer Gudino testified that he never saw Mr. Martinez point the gun at him or any of the other officers, and that he did not perceive Mr. Martinez to make a motion toward pointing the gun at any of the officers. Pl.'s Ex. 18 at 3–4.

8

Officer Osborne also testified that he never saw Mr. Martinez point the gun at any of the officers, direct his attention to Officer Reazin, or begin lifting or pointing the gun. Pl.'s Ex. 19 at 3–4. Detective Lovato testified that he saw Mr. Martinez hold the gun in his right hand, squint at Officer Reazin, put his finger on the trigger, and begin to raise the gun at Officer Reazin. Pl.'s Ex. 2 at 7–11. Detective Lovato also testified that he never saw Mr. Martinez transfer the gun from his right hand to his left hand. *Id.* at 8. Sergeant Hernandez testified that he was concerned about Mr. Martinez squeezing and gripping the handgun, and that he saw Mr. Martinez begin to raise the firearm. Pl.'s Ex. 5 at 6.

None of the officers' bodycam footage provides a view of Mr. Martinez's hands in the moments immediately before or during Sergeant Hernandez firing the 40-millimeter launcher at Mr. Hernandez. *See* Defs.' Ex. C at 00:05:20–00:05:24; Defs.' Ex. D. at 00:05:42–00:05:44; Defs.' Ex. E at 00:05:33–00:05:37; Defs.' Ex. F. at 00:04:57–00:04:59; Defs.' Ex. G at 00:06:52–00:06:58; Defs.' Ex. H at 00:02:08–00:02:14; Defs.' Ex. I at 00:01:36–00:01:40. Nor does one of the cameras of the business, Chrome Aesthetics, provide a view of Mr. Martinez in these moments. Defs.' Ex. J at 00:03:12–00:03:38. A second Chrome Aesthetics camera, however, was mounted above and behind Mr. Martinez and provides a view of him during the moments in question. *See* Defs.' Ex. K. In the moments before the shooting, Mr. Martinez points his handgun toward the ground while holding it in his right hand. *Id.* at 00:02:44–00:02:48. There's a brief moment where Mr. Martinez brings his right hand in front of his body so that the gun is not visible to the camera. *Id.* at 00:02:49–00:02:50. When the handgun is visible again a moment later, the gun is in Mr. Martinez's left hand, pointed at the ground. *Id.* at 0:02:51.

At 3:49 p.m., Sergeant Hernandez fired a 40-millimeter round at Mr. Hernandez after announcing "40-40-40." Doc. 64 ¶ 67; Doc. 74 ¶ 20; Ex. F. at 00:04:57–00:04:59. The 40-

millimeter round impacted Mr. Hernandez while the gun was in his left hand, pointed at the ground. Defs.' Ex. K at 00:02:50–00:02:52. Less than a second later, Detective Lovato fired a round from his rifle at Mr. Hernandez. Doc. 64 ¶ 68; Doc. 74 ¶ 68. The bullet entered Mr. Martinez's neck. Doc. 64 ¶ 73; Doc. 64 ¶ 24. After firing the shot, Detective Lovato shouted, "He's lifting the gun!" Defs.' Ex. I at 00:01:38–00:01:43. Mr. Martinez kept the gun in his left hand pointed at the ground for a few more seconds before dropping it. Defs.' Ex. K at 00:02:50–00:02:54.

Mr. Martinez dropped to his knees, and the handgun fell to the ground behind him as officers approached. *Id.* at 00:03:00–00:03:51. As the officers approached Mr. Martinez, one officer asked, "Did he shoot himself?" Defs.' Ex. F at 00:05:30 – 00:05:31. Another officer replied, "Yeah, he did." *Id.* at 00:05:31–00:05:32. The officers handcuffed Mr. Martinez, who was bleeding and prone on the floor. Defs.' Ex. G at 00:08:58–00:09:12. Detective Lovato told other officers that he shot Mr. Martinez because he was lifting the gun. Defs.' Ex. I at 00:03:03–00:03:11. Emergency medical services arrived and attempted to resuscitate Mr. Martinez, but Mr. Martinez was pronounced dead. Defs.' Ex. Y at 1. At the time of the shooting, Sergeant Hernandez was approximately forty-three feet away from Mr. Martinez, Detective Lovato was approximately sixty-eight feet away from Mr. Martinez, and Officer Reazin was approximately fifty feet away from Mr. Martinez. Doc. 64 ¶ 72; Doc. ¶ 24; Defs.' Ex. X.

## ANALYSIS

Federal Rule of Civil Procedure 56 provides that "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for

10

the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In other words, a dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotations omitted).  As the Tenth Circuit has explained, "the question is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* (citation modified) (quoting *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007)).  The inferences to be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Id.*

## I.        The Court denies summary judgment for Defendants as to Count III.

In Count III, Plaintiff brings claims of excessive force in violation of Mr. Martinez's Fourth and Fourteenth Amendment rights. Doc. 1-2 ¶¶ 87–90.  Defendants raise the defense of qualified immunity in their summary judgment motion.  Doc. 64 at 13–26.  Generally, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact.  *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993).  Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.*

Summary judgment motions involving qualified immunity, however, are decided somewhat differently than other summary judgment motions.  *See Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1995).  Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations omitted).  "When a defendant raises the qualified immunity

11

defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test." *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000).  This is a heavy burden for the plaintiff.  *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (citing *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995)).  "First, the plaintiff must demonstrate that the defendant's actions violated a constitutional or statutory right.  Second, the plaintiff must show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue."  *Nelson*, 207 F.3d at 1206 (quoting *Albright*, 51 F.3d at 1534–35).  Courts have discretion as to which of these two prongs to address first.  See *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

"If, and only if," the plaintiff meets both parts of the qualified immunity test does a defendant bear the traditional burden of "showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law."  *Nelson*, 207 F.3d at 1206 (internal quotations omitted); *see also Estate of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1262 (10th Cir. 2022) ("When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be properly denied.") (internal quotations omitted)).  In other words, although the court "will review the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity."  *Medina*, 252 F.3d at 1128 (citation omitted).  Thus, the Court must grant qualified immunity unless Plaintiff "can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct."  *Gutierrez v. Cobos*, 841 F.3d 895, 900–01 (10th Cir. 2016).

A. <u>A reasonable jury could find facts supporting a violation of Mr. Martinez's constitutional rights.</u>

Under the first prong of the qualified immunity analysis, Plaintiff must demonstrate that a reasonable jury could find facts supporting a violation of a constitutional right. *Gutierrez*, 841 F.3d at 900. The Court examines Plaintiff's excessive force claims "under the Fourth Amendment standard of objective reasonableness."[3] *Zia Trust Co. ex rel Causey v. Montoya*, 597 F.3d 1150, 1154 (10th Cir. 2010) (quoting *Jiron v. City of Lakewood*, 392 F.3d 410, 414 (10th Cir. 2004)). In determining whether an officer's conduct is objectively reasonable, the Court looks "to the totality of the circumstances, viewing the situation from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (internal quotations omitted). The Court may consider the three non-exhaustive factors set forth by the Supreme Court in *Graham v. Connor*, 490 U.S. 386, 396 (1989), as well as other non-exhaustive factors, *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). "The use of deadly force is justified under the Fourth Amendment if a reasonable officer in the Defendant's position would have had probable cause to believe that there was a threat of serious physical harm to themselves or others." *Zia Trust Co.*, 597 F.3d at 1154 (quoting *Walker v. City of Orem*, 451 F.3d 1139, 1159 (10th Cir. 2006)).

---

[3] In Count III, Plaintiff alleges that Detective Lovato's use of deadly force was excessive in violation of Mr. Martinez's rights under both the Fourth and Fourteenth Amendments to the United States Constitution. Doc. 1-2 ¶¶ 87–90. Defendants argue that any claim Plaintiff brings under the Fourteenth Amendment should be dismissed as a matter of law because the alleged constitutional violation invokes only the Fourth Amendment. Doc. 64 at 15–16. Plaintiff clarified in his response that he "is asserting a claim under the Fourth Amendment as incorporated by the Fourteenth, rather than a standalone Fourteenth Amendment due process claim," because the alleged constitutional violation was committed by a state law enforcement officer. Doc. 74 at 16 n.2. Both parties thus appear to agree that Plaintiff's Count III claim should be analyzed under the Fourth Amendment and its "reasonableness" standard. The Fourth Amendment "governs excessive force claims arising from treatment of an arrestee," who, like Mr. Martinez, was "detained *without a warrant*" and "*prior to* any probable cause hearing." *Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) (citation modified).

### 1.  The First *Graham* Factor: Severity of the Crime at Issue

The first *Graham* factor considers "the severity of the crime at issue."  490 U.S. at 396;

*see also Palacios v. Fortuna*, 61 F.4th 1248, 1356 (10th Cir. 2023) ("When the crime at issue is a

felony, regardless of whether the felony is violent or nonviolent, the crime is considered to have

a high degree of severity which weighs against the plaintiff.").  Defendants argue that there was

probable cause to arrest Mr. Martinez for felony shoplifting and for resisting arrest.  Doc. 64 at

18–19.  Plaintiff concedes that this first factor favors Defendants.  Doc. 74 at 23.  Accordingly,

the Court finds that the first *Graham* factor favors Defendants.

### 2.  The Second *Graham* Factor: Immediate Threat to Officers or Others

The second *Graham* factor considers "whether the suspect poses an immediate threat to

the safety of the officers or others."  490 U.S. at 396.  This factor "is undoubtedly the most

important and fact intensive factor in determining the objective reasonableness of an officer's use

of force."  *Pauly v. White*, 874 F.3d 1197, 1215–16 (10th Cir. 2017) (internal quotations omitted).

The Tenth Circuit has articulated four non-exhaustive factors for evaluating the degree of threat

facing an officer:

> (1) whether the officers ordered the suspect to drop his weapon, and the suspect's
> compliance with police commands; (2) whether any hostile motions were made
> with the weapon towards the officers; (3) the distance separating the officers and
> the suspect; and (4) the manifest intentions of the suspect.

*Estate of Larsen*, 511 F.3d at 1260.

#### i.    The First Larsen *Factor*

The first *Larsen* factor asks "whether the officers ordered the suspect to drop his weapon,

and the suspect's compliance with police commands."  *Id.*  Plaintiff acknowledges that this factor

favors Defendants because "Martinez was repeatedly ordered to 'drop' or 'put down' the gun and

14

repeatedly defied these commands." Doc. 74 at 25. The Court accordingly finds that the first *Larsen* factor favors Defendants.

> ii.      *The Second* Larsen *Factor*

The second *Larsen* factor asks "whether any hostile motions were made with the weapon towards the officers." 511 F.3d at 1260. Defendants argue that Mr. Martinez did make a hostile motion with the handgun that prompted both Detective Lovato and Sergeant Herandez to use force, and that both officers perceived Mr. Martinez to be raising the handgun. Doc. 64 at 19–20. Plaintiff argues that "this is a squarely disputed fact," and that Mr. "Martinez kept the gun pointed at the ground and was quite clearly fixated on smoking a cigarette and his movement of the gun was consistent with his stated effort to find one before submitting to arrest." Doc. 74 at 25.

The Court finds that whether Mr. Martinez raised the handgun is a disputed fact. Sergeant Hernandez and Detective Lovato indeed both testified that they perceived Mr. Martinez to be lifting the handgun before they used force. Defs.' Ex. S at 6–7; Pl's. Ex. 2 at 8. However, Officers Osborne and Gudino both testified that they never saw Mr. Martinez point the gun at officers or make any motion to lift the handgun. Pl.'s Ex. 18 at 2–4; Pl.'s Ex. 19 at 3–4. The three remaining officers testified either that they did not have a good view of Mr. Martinez or were not looking at Mr. Martinez at the relevant times. Doc. 87-1 at 1; Pl.'s Ex. N at 3; Defs.' Ex. O at 2. None of the bodycam footage submitted as evidence provides a view of Mr. Martinez at the time he is alleged to have begun raising the handgun. *See* Defs.' Ex. C at 00:05:20–00:05:25; Defs.' Ex. D at 00:05:40–00:05:44; Defs.' Ex. E at 00:05:33–00:05:38; Defs.' Ex. F at 00:04:50–00:05:00; Defs.' Ex. G at 00:06:50–00:06:58; Defs.' Ex. H at 00:02:05–00:02:14; Defs.' Ex. I at 00:01:30–00:01:40.

However, a camera mounted on the wall of Chrome Aesthetics provides a view of Mr. Martinez's hands during most of the relevant time period and appears to corroborate Plaintiff's version of the facts. *See* Defs.' Ex. K. In the moments leading up to the shooting, after Mr. Martinez lowered the gun from his head, Mr. Martinez kept the gun in his right hand, at his side, pointing toward the ground. *Id.* at 00:02:05–00:02:48. He doesn't appear to make any movement to lift the handgun. *See id.* There is a brief moment where Mr. Martinez places his right hand in front of his body and out of view of the camera, appearing to transition the gun from his right hand to his left hand. *See id.* at 00:02:48–00:02:51. There is no view of where the gun was pointing during this moment. When the gun is visible again, it is in Mr. Martinez's left hand, still pointing toward the ground. *Id.* at 00:02:51–00:02:52. Mr. Martinez continues to point the gun at the ground even after being shot, though his left hand does appear to briefly jerk slightly outwards in reaction to the impact of the 40-millimeter round. *Id.* at 00:02:52–00:02:53. The gun remains pointed at the ground until Mr. Martinez drops it. *Id.* at 00:02:52–00:02:54.

Because this fact is in dispute, and the video evidence does not contradict Plaintiff's version of the facts, the Court must adopt Plaintiff's version of the facts and assume that Mr. Martinez kept the handgun pointed at the ground in the seconds leading up to him being shot. *See Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1318 (10th Cir 2009) ("For qualified immunity purposes, the presumed factual dispute arising from the officers' testimony is irrelevant. In determining whether a plaintiff's constitutional rights were violated we ordinarily . . . adopt plaintiff's version of the facts, insofar as it is supported by the record."). But even if Mr. Martinez truly never made a hostile motion with the handgun towards officers, the Court still must consider whether a reasonable officer in Detective Lovato's position would have perceived Mr. Martinez to make a hostile motion with the firearm. *See Estate of Valverde ex rel. Padilla v.*

16

*Dodge*, 967 F.3d 1049, 1064 (10th Cir. 2020) (noting that "an officer does not violate the Fourth Amendment even when in retrospect it is clear that the officer made a mistake in shooting someone who did not pose a threat at the precise moment of the shot").

A reasonable jury could find that Detective Lovato's perception that Mr. Martinez was raising the firearm at Officer Reazin was unreasonable based on the circumstantial evidence. *See Pauly v. White*, 874 F.3d 1197, 1218 (10th Cir. 2017) ("[T]he court may not simply accept what may be a self-serving account by the police officer. Rather, it must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.") (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994))). Detective Lovato testified that he never saw Mr. Martinez transition the handgun from his right hand to his left hand. Pl.'s Ex. 2 at 8. The video evidence clearly shows that Mr. Martinez transferred the gun from his right hand to his left hand before he was shot. Defs.' Ex. K at 00:02:48–00:02:52. Detective Lovato also testified that Mr. Martinez held the gun in his right hand when Detective Lovato shot him. Pl.'s Ex. 2 at 8. But the video shows that Mr. Martinez was holding the gun in his left hand when he was shot. Defs.' Ex. K at 00:02:50–00:02:53. Despite not seeing Mr. Martinez move the gun between his hands, Detective Lovato testified that he was able to see Mr. Martinez put his finger on the trigger of the gun. Pl.'s Ex. 2 at 9. No other officer on scene testified that they saw Mr. Martinez put his finger on the trigger of the gun; two of the officers closest to Mr. Martinez testified that they saw no movements from him warranting the use of deadly force at the time of the shooting. Pl.'s Ex. 18 at 2–4; Pl.'s Ex. 19 at 3–4.

Adopting the Plaintiff's version of the facts, Mr. Martinez did not raise the gun at Officer Reazin, and a reasonable jury could find that Detective Lovato's perception that Mr. Martinez

17

was raising the gun was unreasonable.  The Court accordingly finds that the second *Larsen* factor favors Plaintiff.

       *iii.*    *The Third* Larsen *Factor*

The third *Larsen* factor considers "the distance separating the officers and the suspect." 511 F.3d at 1260.  The Tenth Circuit has determined that "fifty feet, if an officer has cover from a gun-wielding suspect, does not support an immediate threat." *Alcala v. Ortega*, 128 F.4th 1298, 1312 (10th Cir. 2025).  At the time of the shooting, Detective Lovato was about sixty-eight feet away from Mr. Martinez, Defs.' Ex. X at 1, lying prone with his rifle positioned over a rock, Doc. 64 ¶ 55; Doc. 74 at 3.  Detective Lovato testified that "[t]he rock was large enough to stop a round, for cover."  Pl.'s Ex. 2 at 5.  Applying Tenth Circuit precedent, Mr. Martinez did not pose an immediate threat to Detective Lovato when Detective Lovato shot him.  *See Alcala*, 128 F.4th at 1312.

Detective Lovato testified, however, that he shot Mr. Martinez because he believed Mr. Martinez was about to shoot Officer Reazin, Pl.'s Ex. 2 at 6; therefore, Officer Reazin's distance and cover from Mr. Martinez is most relevant to this analysis, *see Pauly*, 874 F.3d at 1205, 1218 (analyzing only the cover and distance of the officer the victim pointed the gun at despite the presence of other officers on scene).  Officer Reazin stood approximately fifty feet away from Mr. Martinez, positioned behind his car door at an angle from Mr. Martinez.  Doc. 64 ¶¶ 70, 72; Doc. 74 at 9; Defs.' Ex. K at 00:02:40–00:02:53.  The parties agree that Officer Reazin had at least some cover from Mr. Martinez.  Doc. 74 at 25; Doc. 87 at 7–8.  Officer Reazin testified that he believed he was positioned with the engine block of his vehicle between himself and Mr. Martinez, and that he was behind proper cover.  Pl.'s Ex. 1 at 5.  The video evidence does not clearly contradict this testimony nor Plaintiff's assertion that Officer Reazin had cover from Mr.

18

Martinez.  Defs.' Ex. K at 00:02:40–00:02:53; *Scott*, 550 U.S. at 380–81 (holding that a court should adopt the nonmoving party's version of the facts unless it is "blatantly contradicted by the record, so that no reasonable jury could believe it").

Defendants also argue that the threat Mr. Martinez posed to the public should be considered in this analysis because "there were buildings in the backdrop of where Detective Lovato was positioned and there was still vehicular traffic on [a nearby street] at the time force was used."  Doc. 64 at 22.  But the threat to bystanders "must have been more than a mere possibility" to justify deadly force.  *Cordova v. Aragon*, 569 F.3d 1183, 1190 (10th Cir. 2009).  And when making the decision to shoot Mr. Martinez, Detective Lovato testified that he was acting to protect Officer Reazin, not any possible bystanders.  Pl.'s Ex. 2 at 6.

Detective Lovato used deadly force against Mr. Martinez because he perceived an immediate threat against Officer Reazin.  Adopting Plaintiff's version of the facts and making every reasonable inference in his favor, Officer Reazin was fifty feet away from Mr. Martinez and had cover from Mr. Martinez.  Because the Tenth Circuit has determined that such circumstances do not constitute an immediate threat, *Alcala*, 128 F.4th at 1312, the Court finds that the third *Larsen* factor favors Plaintiff.

#### iv.   *The Fourth* Larsen *Factor*

The fourth *Larsen* factor considers "the manifest intentions of the suspect."  511 F.3d at 1260.  Defendants argue that Mr. Martinez's manifest intentions were "to continue to flee, resist, and evade to avoid capture," as he refused to put the gun down despite the officers' repeated orders.  Doc. 64 at 22–23.  Plaintiff argues that Mr. Martinez's manifest intentions were "to smoke a cigarette and submit to arrest without harming the officers."  Doc. 74 at 26–27.

19

Defendants are correct that Mr. Martinez never dropped the gun despite numerous commands from officers to drop the gun and submit to arrest. The record also discloses, however, that Mr. Martinez never pointed the gun at the officers or verbally threatened them. After Detective Lovato arrived on the scene, Mr. Martinez told officers, "Let me just smoke a cigarette, I'll put it down." Defs.' Ex. F at 00:04:16–00:04:18. Mr. Martinez also told officers, "I'm not going to shoot at you guys. Maybe I should kill myself." *Id.* at 00:04:25–00:04:32. Detective Lovato testified that he never heard Mr. Martinez say these things, Pl.'s Ex. 2 at 5, but the latter quote is audible on his body camera footage, Defs.' Ex. I at 00:00:38–00:01:13. After requesting a cigarette and seconds before he was shot, Mr. Martinez began patting his legs as if searching for something in his pockets. Defs.' Ex. F at 00:04:40–00:04:48; Defs.' Ex. K at 00:02:30–00:02:53. Viewing the evidence in the light most favorable to Plaintiff, the manifest intention of Mr. Martinez after Detective Lovato arrived on scene was to keep the gun lowered and look for a cigarette.

Defendants argue that the Court should discount that Mr. Martinez ever intended to search for a cigarette, because a search of his body after the shooting revealed no cigarettes on his person. Doc. 87 at 24–25. But the Court must view the facts from the perspective of a reasonable officer on the scene, *Zia Trust Co.*, 597 F.3d at 1154, and Defendants offer nothing to suggest that Detective Lovato or the other officers knew that Mr. Martinez did not have a cigarette in his pockets. The Court thus finds that the fourth *Larsen* factor weighs in favor of Plaintiff.

Applying the *Larsen* factors to determine whether Mr. Martinez posed an immediate threat to the safety of officers or others, the Court finds that the second *Graham* factor favors

Plaintiff.  Three of the *Larsen* factors weigh in favor of Plaintiff while one weighs in favor of Defendants.

### 3.  The Third *Graham* Factor

The third *Graham* factor asks "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Pauly*, 874 F.3d at 1221 (quoting *Graham*, 490 U.S. at 396).  Defendants argue that this factor favors them because "Mr. Martinez actively resisted arrest by arming himself with a firearm; fleeing; and by failing to adhere to any of the directives of law enforcement when they attempted to arrest him."  Doc. 64 at 18.  Plaintiff argues that, while Mr. Martinez defied officers' commands to drop the handgun, "there is no evidence that he was 'actively resisting' or attempting to flee."  Doc. 74 at 23–24.  The Court cannot agree with Plaintiff.

At the time of the shooting, Mr. Martinez was standing in the alcove of Chrome Aesthetics and not attempting to flee from that position.  Defs.' Ex. K at 00:02:36–00:02:52.  But Mr. Martinez was indisputably defying numerous commands from officers to drop his firearm.  Although Plaintiff argues that this defiance should not be construed as active resistance to arrest, Doc. 74 at 23–24, he has not directed the Court's attention to binding authority that supports this argument, and the out-of-circuit cases that Plaintiff does cite are distinguishable.

In *Phillips v. Community Insurance Corp.*, the suspect refused to exit her vehicle despite multiple orders from police.  678 F.3d 513, 525 (7th Cir. 2012).  The court refused to construe the suspect's defiance as active resistance because she "never exhibited any sort of aggressive behavior toward the officers before or after they located her car, nor did she make any attempt to escape."  *Id.* at 524.  The court further found the threat of the suspect using her car as a weapon was diminished because "officers had her vehicle surrounded with seven squad cars, and behind

the vehicle there was a steep drop-off.  There was nowhere for [the suspect] to go." *Id.* at 525.

Here, Mr. Martinez was not trapped in a car but was armed with a firearm.  While the suspect in

*Phillips* was unable to effectively use her car as a weapon against officers, no similar restraints

prevented Mr. Martinez from firing his handgun at the officers.  And while Mr. Martinez did not

attempt to escape the alcove of the Chrome Aesthetics in the moments leading up to the shooting,

he had just led police on a chase through a parking lot, an occupied business, and across traffic.

Doc. 64 ¶¶ 9–34; Doc. 74 at 2, 9.

In *Estate of Escobedo v. Bender*, the Seventh Circuit concluded that the victim was not

resisting arrest because he "had not committed a crime, there were no efforts to arrest him for the

commission of a crime," and the officers were attempting to seize him "for a twenty-four-hour

mental health watch."  600 F.3d 770, 780 (7th Cir. 2010).  It stands to reason that a person cannot

be accused of resisting arrest where they are not subject to arrest in the first place.  *See Pauly*,

874 F.3d at 1221–22 (finding that the third *Graham* factor supported plaintiffs where officers

"were not there to make an arrest because no grounds existed to do so").  Similarly, in *Mattos v.*

*Agarano*, the Ninth Circuit drew "a distinction between a failure to facilitate an arrest and active

resistance to arrest," but did so in the context of an unarmed bystander who did not immediately

move out of an officer's way when the officer attempted to arrest someone else.  661 F.3d 433,

449–450 (9th Cir. 2011).  The court clarified that "the crux of this *Graham* factor is compliance

with the officers' requests, or refusal to comply," and noted that the bystander there had been

attempting to comply with the officer's request.  *Id.* at 450.

Here, the police officers were attempting to arrest Mr. Martinez, and Plaintiff concedes

that the crime at issue was severe.  Doc. 74 at 23.  Further, Mr. Martinez fled when first

confronted by police.  Doc. 74 at 9 (stating that Mr. Martinez stopped in front of the Chrome

22

Aesthetics "[a]fter recklessly leading police on a chase through streets and business while armed with a gun"). Although he no longer was fleeing in the moments before he was shot, he still was defying officers' commands to drop his weapon and surrender. Doc. 74 at 23. Plaintiff has not persuaded the Court that Mr. Martinez was not actively resisting arrest under these circumstances, and the Court accordingly finds that the third *Graham* factor favors Defendants.

### 4. Other Circumstances

While the *Graham* and *Larsen* factors are helpful for determining whether a constitutional violation has occurred, they are non-exhaustive, and "in the end the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Larsen*, 511 F.3d at 1260.

Whether other officers on scene were prepared to use force is also relevant to the totality of the circumstances analysis. *Estate of Taylor v. Salt Lake City*, 16 F.4th 744, 769 (10th Cir. 2021). Six other officers were present at the scene with Detective Lovato, and Sergeant Hernandez was the only other officer to use force against Mr. Martinez. Sergeant Hernandez testified that he saw Mr. Martinez begin to raise the handgun, and that this movement prompted him to fire the less-lethal 40-millimeter round at Mr. Martinez. Defs.' Ex. S at 6–7. Officer Osborne testified that he never pulled the trigger of his firearm because he "didn't have any assaultive factors . . . [l]ike lifting the gun, or pointing it." Pl.'s Ex. 19 at 4. Officer Gudino testified that he never saw Mr. Martinez point the gun at him or any of the other officers, and that he read Mr. Martinez's body language after lowering the gun from his head as "a sign of defeat. He just kind of got tired." Pl.'s Ex. 18 at 3–4. Officer Reazin testified that he was not looking at Mr. Martinez at the time the 40-millimeter round was fired, Doc. 87-1 at 1, but that before it was fired he never perceived an increase in the threat that Mr. Martinez posed "[b]ecause the gun was

23

pointed at the ground the whole time," Pl.'s Ex. 1 at 3.  Sergeant Vanderlip testified that Mr. Martinez stepped out of his view when he was shot, but that before he stepped out of view the firearm was still at Mr. Martinez's side.  Defs.' Ex. N at 3.  Acting Sergeant Greenhaw testified that, from his position, his view of Mr. Martinez was obstructed from the lower chest down, but he also testified that he was "hyper-focused . . . on his hands, watching the firearms and his mannerisms," and was still able to see Mr. Martinez transition the firearm from one hand to the other.  Defs.' Ex. O at 2.

The Court is reluctant to "second-guess the split-second decisions of trained officers reacting to difficult situations in the line of duty."  *Cordova*, 569 F.3d at 1190.  But here, the Court is presented with the conflicting decisions of multiple trained officers reacting to the same difficult situation.  In *Valverde*, the Tenth Circuit reasoned that "the failure of the other officers to fire is of little relevance" where only two of six officers on scene saw the suspect draw the gun and the second officer was in no position to fire at the suspect.  967 F.3d at 1065.  These are not the circumstances here.  Five officers, at least two of whom testified they could see Mr. Martinez at the time of the shooting, decided not to fire their weapons.  Pl.'s Ex. 18 at 3–4; Defs.' Ex. O at 2.  Another officer, Sergeant Hernandez, testified that he saw Mr. Martinez begin to raise his handgun, and he decided to use less-lethal force against Mr. Martinez.  Defs.' Ex. S at 6–7.  Detective Lovato was the only officer on scene who reacted with deadly force to the threat Mr. Martinez posed.  A reasonable jury could find that Detective Lovato acted unreasonably in using deadly force in a situation where other officers on scene deemed such force unnecessary.

The Court finds that Plaintiff has met his burden of establishing that a reasonable jury could find that Detective Lovato violated Mr. Martinez's Fourth Amendment rights.  While the first and third *Graham* factors favor Defendants, the second and most important factor favors

Plaintiff. Additionally, the fact that Detective Lovato was the only officer of the seven on scene to use deadly force against Mr. Martinez favors Plaintiff. Of course, this is not to say that a reasonable jury could *not* find that Detective Lovato's actions were reasonable. Rather, the Court holds that whether Detective Lovato's conduct was reasonable "has not been established as a matter of law, based on the undisputed facts in the record and in light of the parties' arguments." *Cordova*, 569 F.3d at 1192.

B.  <u>The law was clearly established on November 25, 2023, that it is unconstitutional for an officer to use deadly force against a non-fleeing suspect armed with a firearm unless there are objective indicia that could reasonably be interpreted to suggest that use of the firearm against another person is imminent.</u>

Even if Mr. Martinez's Fourth Amendment rights were violated, Detective Lovato still is entitled to qualified immunity if the right was not clearly established at the time of the shooting. *Nelson*, 207 F.3d at 1206. To meet his burden here, Plaintiff "must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as [Plaintiff] maintains." *Valverde*, 967 F.3d at 1067 (quoting *Callahan v. Unified Gov't of Wyandotte Cnty.*, 806 F.3d 1022, 1027 (10th Cir. 2015)). But because "there will almost never be a previously published opinion involving exactly the same circumstances," the analysis is not "a scavenger hunt for prior cases with precisely the same facts," but rather "whether the law put officials on fair notice that the described conduct was unconstitutional." *Fancher v. Barrientos*, 723 F.3d 1191, 1201 (10th Cir. 2013) (quoting *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007)).

Plaintiff argues that it was clearly established at the time of the shooting "that it is unreasonable for an officer to use deadly force against a non-fleeing suspect armed with a firearm . . . unless there are objective indicia that could reasonably be interpreted to suggest that use of the firearm against another person is imminent." Doc. 74 at 31. Defendants cite *Valverde*,

25

where the Tenth Circuit held that "[t]he law permitted [the officer] to fire as soon as he saw the gun in [the suspect's] hand." Doc. 87 at 28 (quoting 967 F.3d at 1063). But the facts of *Valverde* are distinguishable from those here. In *Valverde*, police officers rapidly exited a van and approached a suspect in the middle of a drug deal. 967 F.3d at 1056–57. As the officers approached the suspect, the suspect reached into his shorts and pulled out a gun, prompting one officer to shoot the suspect. *Id.* at 1057. There was "no dispute that [the suspect] drew a gun, and that [the officer] saw [the suspect] take the gun out before using deadly force." *Id.* The Tenth Circuit concluded that "no jury could doubt that [the officer] made his decision to fire before he could have realized that [the suspect] was surrendering (by dropping his gun and raising his hands)." *Id.* at 1062.

Here, Mr. Martinez already had drawn the gun and had kept it in his hands for the duration of the stand-off. Mr. Martinez either pointed the gun at his own head or kept it pointed at the ground. Detective Lovato did not shoot at Mr. Martinez as soon as he arrived on scene and saw that Mr. Martinez was armed. Rather, Detective Lovato stated that he shot Mr. Martinez after seeing him begin to raise his handgun at Officer Reazin. Pl.'s Ex. 2 at 6. Unlike in *Valverde*, where there was no dispute that the suspect rapidly drew a gun as officers approached, 967 F.3d at 1057, here it is disputed that Mr. Martinez actually raised his handgun at Officer Reazin. And as explained above, viewing the facts in the light most favorable to Plaintiff, Detective Lovato was mistaken in perceiving Mr. Martinez to be raising the firearm, and a reasonable jury could find that this perception was unreasonable.

Further, while "officers are not required to await the glint of steel before taking protective action," *Palacios*, 61 F.4th at 1262 (internal citations omitted), and "waiting to find out what the suspect planned to do with the weapon could be suicidal," *Valverde*, 967 F.3d at 1062, the Tenth

Circuit has not adopted a "per se rule of objective reasonableness" for the use of deadly force against an armed suspect—even where the suspect points a gun at police, *Pauly*, 874 F.3d at 1217. Indeed, Plaintiff cites several Tenth Circuit cases in support of his argument that deadly force is unconstitutional against an armed, or suspected-to-be-armed, non-fleeing suspect where there are no objective indicia that could reasonably be interpreted to suggest that use of the firearm against another person is imminent. Doc. 74 at 33–34; *cf. Valverde*, 967 F.3d at 1057, 1062 (reversing denial of qualified immunity where an officer shot a suspect who indisputably drew a gun as officers approached); *Cruz v. City of Deming*, 138 F.4th 1257, 1264 (10th Cir. 2025) (affirming grant of qualified immunity where the suspect lifted a weapon off the ground and moved the barrel towards officers); *Alcala*, 128 F.4th at 1308 (affirming grant of qualified immunity where the suspect made a "sudden threatening movement" when he "twisted his body to face the officer while extending his right arm and pointing his finger as if a gun"); *Taylor*, 16 F.4th at 750 (affirming grant of qualified immunity where the suspect "rapidly removed his left hand from his waistband" and "withdrew his right hand from his waistband but lower than his left hand" in a motion "consistent with the drawing of a gun"); *Thomson*, 584 F.3d at 1319 (affirming grant of qualified immunity where "the gun still was pointed toward the officers almost immediately prior to" the shooting, "although it was pointed upward towards [the suspect's] head when the shot was fired"). Plaintiff correctly notes that in these cases, "the suspect performed some action that changed the status quo by escalating the apparent risk that a firearm would be used to harm officers or others." Doc. 74 at 34.

Further, Plaintiff also demonstrates that the weight of authority from other Circuits holds that deadly force is unconstitutional against an armed, or suspected-to-be-armed, non-fleeing suspect where there are no objective indicia that could reasonably be interpreted to suggest that

27

use of the firearm against another person is imminent.  Doc. 74 at 31–32; *see McKenney v. Mangino*, 873 F.3d 75, 83–84 (1st Cir. 2017) (affirming denial of qualified immunity where a suspect "never came close to pointing his gun in the [officer's] direction"); *Aleman v. City of Charlotte*, 80 F.4th 264, 295–96 (4th Cir. 2023) ("[T]he failure to obey commands by a person in possession of, or suspected to be in possession of, a weapon only justifies the use of deadly force if that person makes some sort of furtive or other threatening movement with the weapon, thereby signaling to the officer that the suspect intends to use it in a way that imminently threatens the safety of the officer or another person.") (quoting *Knibbs v. Momphard*, 30 F.4th 200, 225 (4th Cir. 2022))); *King v. Taylor*, 694 F.3d 650, 663 (6th Cir. 2012) (explaining that an officer's use of deadly force would be unreasonable if the suspect "did not point a gun towards the officers just before he was shot"); *Weinmann v. McClone*, 787 F.3d 444, 449–50 (7th Cir. 2015) (rejecting officer's argument that his life was in danger because of the way the suspect held a gun because how the suspect held the gun was a disputed fact); *Cole v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020) (explaining that "an individual's mere possession of a firearm is not enough for an officer to have probable cause to believe that individual poses an immediate threat of death or serious bodily injury; the suspect must also point the firearm at another individual or take similar menacing action") (internal quotations omitted)); *George v. Morris*, 736 F.3d 829, 830 (9th Cir. 2013) (reasoning "that the fact that the suspect was armed with a deadly weapon does *not* render the officers' response per se reasonable under the Fourth Amendment," but "a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat") (internal quotations omitted)).

The Court therefore agrees with Plaintiff that the law was clear on the date of the shooting that the use of deadly force is unconstitutional against an armed suspect who is not

fleeing, unless there are objective indicia that reasonably could be interpreted to suggest that use of the firearm against another person is imminent.  Indeed, Detective Lovato and the other officers on scene appeared to believe that deadly force would not be warranted against Mr. Martinez until Mr. Martinez made a hostile motion with the firearm.  *See* Pl.'s Ex. 2 at 7 (Detective Lovato testified that, while Mr. Martinez "was always a threat with a handgun," he did not make the decision to shoot Mr. Martinez until he saw Mr. Martinez begin to lift the gun); Pl.'s Ex. 18 at 2 (Officer Gudino testified that he did not shoot at Mr. Martinez because he never perceived Mr. Martinez to point the firearm at him); Pl.'s Ex. 19 at 4 (Officer Osborne testified that he never fired his firearm because Mr. Martinez never lifted or pointed the handgun); Defs.' Ex. M at 4 (Officer Reazin testified that, while "the threat was always there, because he was armed with a gun," the threat did not rise to the point where he felt "force was needed at that point").

Plaintiff has met his burden of showing that the constitutional right at issue was clearly established at the time Detective Lovato used deadly force against Mr. Martinez.  Given this finding, in addition to the Court's prior determination that there remains an unresolved dispute of material fact relevant to the qualified immunity analysis, the Court denies summary judgment for Defendants as to Count III.  *See Beauford*, 35 F.4th at 1261–62, 1270.

**II.    The Court denies summary judgment as to Plaintiff's § 1983 municipal liability claim.**

Defendants argue that the City of Albuquerque is entitled to summary judgment on Count IV, Plaintiff's 42 U.S.C. § 1983 municipal liability claim, because the City cannot be held liable for a constitutional violation if Detective Lovato did not violate Mr. Martinez's constitutional rights.  Doc. 64 at 34.  Plaintiff argues that summary judgment should be denied as to this claim

if the Court finds that there is a genuine issue of material fact as to whether Detective Lovato violated Mr. Martinez's constitutional rights.  Doc. 74 at 35.

To succeed on a § 1983 claim against a municipality, Plaintiff must prove "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Oklahoma Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1317 (10th Cir. 1998).  "A municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993).  Because there is a genuine issue of material fact as to whether Detective Lovato violated Mr. Martinez's constitutional rights, Defendants' argument fails as to the first prong of the § 1983 municipal liability analysis.  Defendants do not provide an argument as to the second prong of the analysis.  *See* Doc. 64 at 34; Doc. 74 at 35. The Court therefore will deny summary judgment for Defendants as to Plaintiff's municipal liability claim.

### III.    Plaintiffs' claims under the New Mexico Constitution.

In addition to his claims under the United States Constitution, Plaintiff brings claims under the New Mexico Constitution.  In Count I, Plaintiff asserts that Detective Lovato, acting on behalf of the City of Albuquerque, used excessive force against Mr. Martinez in violation of his rights under Article 2, Sections 10 and 18, of the New Mexico Constitution.  Doc. 1-2 ¶¶ 76–79.  In Count II, Plaintiff asserts direct constitutional violations by the City in its "maintenance of a custom of excessive force against people in crisis, its deliberate failures to implement reforms, and its decision to authorize and empower Defendant Lovato to use deadly force against people in crisis despite his history."  *Id.* ¶¶ 80–86.

30

A. The Court denies summary judgment as to Count I.

Defendant first argues that only Section 10 of Article 2 of the New Mexico Constitution is applicable to Plaintiff's excessive force claims, and that the excessive force analysis under that constitutional provision is the same as the excessive force analysis under the Fourth Amendment to the United States Constitution. Doc. 64 at 26–27. Plaintiff argues that summary judgment should be denied as to Count I if the Court denies summary judgment on his Fourth Amendment excessive force claims. Doc. 74 at 36.

"Both the Fourth Amendment to the United States Constitution and Article II, Section 10, of the New Mexico Constitution protect the right of the people to be free from unreasonable searches and seizures." *State v. Gutierrez*, 2004-NMCA-081, ¶ 6, 136 N.M. 18, 20, 94 P.3d 18, 20. The New Mexico Supreme Court has adopted the interstitial approach in interpreting state constitutional provisions, explaining that if the right allegedly violated is protected under the United States Constitution, then a separate analysis under the New Mexico Constitution is not conducted. *State v. Gomez*, 1997-NMSC-006, ¶¶ 19–25, 122 N.M. 777, 783–85, 932 P.2d 1, 7–9. While the New Mexico Supreme Court has interpreted Article II, Section 10, more expansively than the Fourth Amendment, the New Mexico Constitution cannot be construed to provide less protection than the United States Constitution guarantees. *Id.* ¶¶ 17, 24, 122 N.M. at 782, 784, 932 P.2d at 6, 8. Therefore, conduct that violates the Fourth Amendment necessarily violates Article II, Section 10, of the New Mexico Constitution. Because the Court denies summary judgment for Defendants on Plaintiff's federal constitutional claim, the Court agrees with Plaintiff that summary judgment similarly cannot be granted as to Plaintiff's state constitutional claim in Count I.

B.  The Court denies summary judgment as to Count II.

Defendants argue that Plaintiff's claim against the City in Count II is derivative of his

§ 1983 municipal liability claim in Count IV.  Doc. 64 at 26–27.  Defendants accordingly argue

that this claim necessarily fails if there was no underlying constitutional violation, and they state

that they will address this claim in a separate motion if they do not prevail on Count I.  *Id.* at 27.

Plaintiff agrees that if the Court denies summary judgment as to Count I, summary judgment also

should be denied as to Count II.  Doc. 74 at 36.  Because the Court denies summary judgment as

to Count I, the Court denies summary judgment for Defendants as to Count II.

**IV.  The Court denies summary judgment as to Plaintiff's tort claims in Count V.**

Defendants move for summary judgment on Plaintiff's tort claims brought under the New

Mexico Tort Claims Act ("NMTCA"), which waives immunity for law enforcement officers

acting within the scope of their duties when they commit intentional torts such as battery.  *See*

N.M. STAT. ANN. § 41-4-12 (2026).  In Count V, Plaintiff brings claims of battery against both

Detective Lovato and the City, as well as claims of negligence resulting in battery against the

City.  Doc. 1-2 ¶¶ 99–103; Doc. 74 at 37–38.  Defendants argue that these claims fail as a matter

of law because (1) Detective Lovato's use of force against Mr. Martinez was not an unlawful

battery, and (2) the City's negligence must have caused a third party other than law enforcement

to commit an intentional tort.  Doc. 64 at 29–34.

In New Mexico, a law enforcement officer will not be held civilly liable for his or her use

of force as long as the officer acts with a reasonable belief that the amount of force is necessary

under the circumstances.  *Bledsoe v. Garcia*, 742 F.2d 1237, 1240 (10th Cir. 1984).  "Unlike the

Fourth Amendment analysis, the immunity analysis under the [NMTCA] includes both an

objective and a subjective test."  *Cruz*, 138 F.4th at 1272 (citing *Hernandez v. Parker*, 2022-

32

NMCA-023, ¶¶ 31–32, 508 P.3d 947, 958).  The officer "must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation." *Id.* (quoting *Hernandez*, 2022-NMCA-023, ¶ 31, 508 P.3d at 958).  Thus, a plaintiff's failure to establish a Fourth Amendment violation is not a defense to claims for assault and battery brought under the NMTCA.  *Hernadez*, 2022-NMCA-023, ¶¶ 31–32, 508 P.3d at 958.  Here, Detective Lovato's use of force must have been both objectively *and* subjectively reasonable to establish a defense to battery under the NMTCA.  *See id.* (holding that an officer is not entitled to a "complete defense to civil assault and battery" even where the officer's conduct was found objectively reasonable under a Fourth Amendment analysis); *Cruz*, 138 F.4th at 1272–73 (analyzing officers' subjective reasonableness after concluding that their conduct was objectively reasonable under the Fourth Amendment).  As explained above, a reasonable jury could find facts supporting a violation of the Fourth Amendment, and Defendants therefore have not met one of the two requirements for the defense: that Detective Lovato's use of force was objectively reasonable. The Court therefore denies summary judgment as to Plaintiff's battery claims against Detective Lovato.  *See Torgeson v. Starr*, 727 F. Supp. 3d 962, 987–88 (D.N.M. 2024) (denying summary judgment for police officer on claims brought pursuant to the NMTCA where genuinely disputed material facts existed about whether the plaintiff made any hostile motions with a weapon towards officers).

Defendants also argue that the City can only be held liable under the NMTCA if it "engaged in negligent conduct and caused a non-law enforcement third party to commit an intentional tort." Doc. 64 at 30.  But the New Mexico Supreme Court has held that a political entity such as a city can be held liable for the tortious acts of an employee (1) if the city had

direct supervisory responsibility or control over the employee responsible for the harm, and (2) the city's conduct is not remote enough to limit its liability. *Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't*, 1996-NMSC-021, ¶¶ 14–17, 121 N.M. 646, 651–52, 916 P.2d 1313, 1318–19. Defendants do not argue under either criterion that the City cannot be held liable for Detective Lovato's battery; rather, they argue that Detective Lovato did not commit an unlawful battery. *See* Doc. 64 at 29–34. Accordingly, the Court denies summary judgment as to Plaintiff's battery claim against the City.

Regarding Plaintiff's claim against the City for negligence resulting in battery, Defendants argue that the City cannot be held liable for negligence that causes a battery if that battery is committed by a law enforcement officer; they contend that the battery must be committed by a "non-law enforcement" third party. Doc. 64 at 30–31. In support, Defendants emphasize the New Mexico Supreme Court's holding that "the Tort Claims Act waived governmental immunity not only for intentional torts committed by law enforcement officers, but also for acts committed by *third parties* when caused by the negligence of the officers." *Id.* at 30 (quoting *Weinstein*, 1996-NMSC-021, ¶ 21, 121 N.M. at 652, 916 P.2d at 1319). In response, Plaintiff cites a case from the New Mexico Court of Appeals holding that the rule that "immunity is waived when a law enforcement officer causes the commission of certain listed torts by a third person" does not "encompass only occasions when the listed tort was committed by someone other than a law enforcement officer." *Ortiz v. New Mexico State Police*, 1991-NMCA-031, ¶ 10, 112 N.M. 249, 252, 814 P.2d 117, 120; *see also Johnson v. City of Roswell*, 752 F. App'x 646, 653 (10th Cir. 2018) (The NMTCA recognizes negligence claims based on failure to train or supervised subordinate officers where "the subordinate officer committed an intentional tort."); *Quezada v. County of Bernalillo*, 944 F.2d 710, 719 (10th Cir. 1991) (stating that the Tenth

Circuit is bound by *Ortiz*'s interpretation of the NMTCA unless the New Mexico Supreme Court or legislature overrule *Oritz*). Defendants provide no response to this argument in their Reply brief, simply stating that they have "nothing further to add to the arguments, points, and authorities cited in [their] summary judgment motion." Doc. 87 at 29.

Because there are genuine disputes of material fact as to whether Detective Lovato committed an unlawful battery, and because the City could be held liable for the unlawful battery as well as negligent training and supervision resulting in that unlawful battery, the Court cannot conclude that Defendants are entitled to judgment as a matter of law on Plaintiff's NMTCA claims. The Court accordingly denies summary judgment as to Count V.

## CONCLUSION

For the foregoing reasons, the Court denies Defendants' Motion for Summary Judgment (Doc. 64). Plaintiff has met his heavy burden of overcoming Defendants' qualified immunity defense, and Defendants have not demonstrated that there is no genuine issue of material fact such that Defendants are entitled to judgment as a matter of law on all of Plaintiff's claims.

_____
Laura Fashing
United States Magistrate Judge